That will take us to West Coast Bancorp v. Bancinsure, which is the next case on calendar. And for planning purposes, we will be taking a short recess before we get to PNGC. You're Mr. Podwell. I'm John Folan, Your Honor. Oh, you're the other side. Okay. And I had some handouts that I hope would... That's okay. Before we get to your handouts, we have a pleasant administrative matter. Mr. Podwell, who was forced into service for the Court's convenience, we're unable to continue this case. Mr. Podwell has applied, I understand, for admission to the Ninth Circuit Bar. If you'll step to the lectern, we'll start you off with being sworn in. You get a special treatment today, at least for that. Thank you, Your Honor. And we do appreciate counsel's accommodation to the Court's schedule. I'm going to administer the oath, and you can... I understand you filled out the forms and all of that, so we have a legal argument. I want to make sure we get you sworn in. So if you raise your hand. Aye. Aye. Laura Podwell. Do solemnly swear or affirm. Do solemnly swear or affirm. Okay, that I will conduct myself as an attorney. That I will conduct myself as an attorney. And counselor of this Court. And counselor of this Court. Uprightly and according to law. Uprightly and according to law. And that I will support. And that I will support. The Constitution of the United States. The Constitution of the United States. Congratulations. You're now a member of the Ninth Circuit Bar. Thank you very much. All right. Now we'll get to the business at hand, which is your argument. And if you'll introduce yourself again now. Thank you, Your Honor. I'm going to try to be as brief as I can. What I'd like to cover is notice, first, coverage. State your name and all that for the record. I sort of threw you off, and I want to make sure our record's complete. John Folon for the plaintiffs in this case. I'd like to talk about notice first, coverage, and then whether the Fishers were borrowers. All right. Thank you. So to expedite that, I have given the Court and counsel handouts. My argument on notice is very simple. I'm sorry. I can't hear you very well. My argument on notice is very simple. Section 8B of the basic policy has five conditions it must be complied with in order to have a proper notice of a potential claim. The bank's notice, which was given just before the expiration of the policy, complied with each one of these requirements. And with respect to whether this was notice of a D&O claim or a lender liability claim, you simply have to look at number four, which identifies the claimants as not shareholders in a corporation who would bring a claim for breach of fiduciary duty against a director or an officer, but the claimants are Fisher Investments and Bass Construction Company, and the insureds are not directors or officers, but instead are West Coast Bank, the Bank of Newport, and potentially Miss Rodriguez. Now, how would the insured know all of that information? All that's said is just, as I say, the names of the potential claimants. So how are they supposed to figure out the reference itself as to the D&O liability insurance policy? Because if you go to the basic policy, Your Honor, which is a D&O coverage, the people who are covered basically as insureds are referred to as insured persons, and insured persons is defined as meaning all persons who were, now, or shall be directors and officers of the company. So the notice did not say that the claim would be made against any director or officer of the company, but instead potentially against West Coast Bank and the Bank of Newport. If an employee makes an improper loan, are you saying, and the bank suffers extensive liability, are you saying that the directors and officers or officer who is in the chain of command over that employee couldn't be sued for the harm to the bank? I think that's correct, yes. The officers and directors didn't make any misrepresentations. A claim that could be made under that? They're agents of the bank, but the officers and directors didn't do anything. They didn't make any representations. Wait a minute. All that is said in this letter, I mean, I'm not unsympathetic overall to the notice issue, but to say that you can tell because it's only an employee of the bank who issued a commitment letter, that that automatically rules out any potential claim against directors and officers. Well, it's possible that when the lawsuit was filed, Fishers and Bass presumably could have sued directors and officers, but in fact they didn't. Well, isn't it a clear point that this notice says that it could be a claim against West Coast Bank or other insurers? So while it leaves open the possibility of a suit against the directors and officers, it also talks about a suit against West Coast Bank, which wouldn't be under the director and officers policy. And that's the point is the word insured is only used in the lender liability endorsement. Insured is not used in the DNO. Insured persons is used. But that doesn't matter. But doesn't the fact that it could be a policy against West Coast Bank or eliminate the possibility that it wouldn't be under the directors and officers policy, or am I wrong about that? I'm sorry. Isn't the directors and officers policy with regard to claims against the directors and officers? There are two coverages here. I understand that. One of them is a directors and officers policy. Which does not insure West Coast Bank. Exactly. So therefore the fact that this mentions a claim against West Coast Bank means that it couldn't be mentioning a claim only under the directors and officers. It might be also under the directors and officers, but not only under the directors and officers. I guess what I would say is what was bank insurer's first response to this notice? It was you have put us on notice of a potential claim, a potential lender liability claim. Bank insurer understood what this notice was. And my point on notice is that at a minimum this is a question of fact. I don't think you can resolve this issue on this record as a matter of law on notice. And I would say that if the notice is appropriate, as we believe, then you have to determine. Well, there is also an aspect. The question of the legal aspect is whether or not you can make your claim or file your notice under the, what, Paragraph 7 or whatever the basic policy, or whether you have to, whether the lender liability endorsement has its own notice proviso, and that they're arguing that you can't rely on the more general prospective claim language. Isn't that part of it because it's a claims-made coverage? Well. So in that aspect, that's not a factual issue. We'd have to resolve the legal contract interpretation issue, would we not? The words directors and officers liability insurance policy are used throughout the D&O coverage and in the endorsement. That's not my question. You said it was a question of fact. On notice, the whole notice issue is a question of fact. Now, I don't think that's right. It may be whether or not factually what happened in terms of the bank's response and understanding may be, but there's also legal questions, as I understand it. You're starting to argue the legal meaning of the contract. That's just my point. Isn't that something we do have to address? Well, I think they have done that by setting forth what is required in the notice, and the bank's response is we made an alleged loan commitment, so forth and so on. That's notice of a lender liability claim. Okay. The point on coverage is that sections, this is on page three of the handout. I'm sorry, do you start with page two? Does the counsel for your opponents have copies of this? Yes, he does. I provided a copy yesterday. On page two of the handout, the insuring agreement says that the basic policy is amended. It doesn't say how the basic policy is amended. To determine how the basic policy is amended, you have to go to section five, general conditions. Section five sets forth several exceptions, several ways in which the basic policy is amended so that it is now tailored for lender liability coverage and not director's and officer's coverage. No exceptions are made to the key provisions, which are sections three, 6B, and 8B of the basic policy. So all of those provisions are incorporated into the lender liability coverage. I never find these handouts very useful because we usually know what's in them, and they're obviously self-interested. And if you're going to do it, you have to include everything. And there are other provisions that are, in fact, relevant as well, which aren't in here. So now I have to go back and look at the clause itself because I know there are others because I've read the record, so it's not helpful. But go ahead. And I will tell you what the others are in a minute. Go ahead. When I find them. Well, our point is that these sections are incorporated into the lender liability coverage, and they mean something. You can't just write them out under Oregon law. For example, the two things, as I understand it, that the district court most relied upon and that your opponent relies upon is, A, the language about while this endorsement is in force, which you have an answer to. I understand that. And also the provision that says somewhere that a claim under the director's and officer's provision is separate from a claim under the endorsement has to be separately stated, something like that. All right. Neither of those are in your handout, so I can't use your handout. Well. So could you tell me why those two things don't matter? I'm sorry. I had a hard time hearing, Your Honor. Your handout does not include two other provisions in the endorsement, the ones that were principally relied on as opposing your position. First, that the endorsement talks about when the endorsement is in force. Right? That's not in your handout. Secondly, there's another provision, which I don't have my hands on right now, which says that a claim under the director's and officer's policy does not constitute a claim under the lender liability. Right. Neither of those are in your handout, so your handout's not very useful. The handout does have both provisions that deal with in force. That's on page four. The basic policy, D&O policy, in the upper right-hand corner, in all caps, uses the term in force. And Bank Insure admits that if this had been a D&O claim, the notice would have been proper, and as to a subsequently filed lawsuit, there would have been coverage. The problem is that Bank Insure has to say that in force means one thing in the basic policy, and it means something else in the lender liability endorsement. It can't mean two different things. It's not defined. It simply can't mean two different things. In force is used in the insuring agreement of the lender liability endorsement is there because this insuring agreement replaces the insuring agreements of the basic policy. But it's clear that in force is used twice in this policy, and it has to have the same meaning. And so if the policy remains in force as to a director and officer's claim, it has to remain in force to a duly noticed lender liability claim. Now, on the Court's other point regarding notice of one claim can't be the notice of another claim, I think if, in fact, when the Fishers and Bass sued, if they had sued directors and officers and had not sued West Coast Bank and what was once the Bank of Newport, we would have a problem. But that's not what happened here. The notice was notice of we're concerned there's going to be a claim against West Coast Bank, and that was the claim that was filed. So with that, I would like to briefly turn to the issue of borrower, and this deals with page five of the handout. In this case, there have been three definitions of borrower, the endorsement definition, which is set forth, the district court's definition, and bank insurer's definition in its brief. What I've done is put the dictionary definition at the very top. So we have this. We've read the briefs, okay? We've read the contracts, so, you know. And my point here is there's a difference between the dictionary definition and all the other definitions, and that difference is? If Bass got the money, in other words, they funded the law, and then Bass took the money and went to Mexico, could the bank sue the Fishers? If Bass took the money, got the money. Went to Mexico. Went to Mexico. Could Bass? I'm from Southern California, so they all go to Mexico. Well. Let's say they went someplace else. I mean, in other words, are the Fishers liable to the bank if Bass doesn't repay the loan? No. The Fishers are not. The Fishers had no obligation to repay. That's the dictionary. They didn't have any credit at all at issue. The Fishers' credit. I'm sorry? The Fishers. No credit was extended to the Fishers or negotiated to the Fishers. Well, under federal banking regulations, those definitions, that's not true. But even with those. I'm not sure. You know, you're talking about Part 32, 32.1. But that deals with a very specific regulation of the control of the currency, where they're talking about the amount of money loaned to one particular entity, and they have to amend the definition of borrower to add to it the people who are related to the transaction. But even the definition of borrower under 32.2 itself, borrower qua borrower, doesn't include that. They have to add that. They say it also includes. But that's for the specific purpose of figuring out the soundness of the lending transaction, not for the purposes of liability. Well, the banking regulations are relevant to these issues because the endorsement refers to, in one of the exclusions, I think it's exclusion 9 or 10, if you violated any federal banking law or regulations, there's no coverage. But my point in these definitions is that the endorsement definition does not state that a borrower has to be the person who has an obligation to repay. It just doesn't say that. It doesn't say that. But doesn't it say that they have to be the person to whom credit was extended? Well, I mean, we've parsed the grammar here. That's what you've highlighted. And I don't know. I would agree with you that the grammar's not terrific. But still. To which an extension of credit was negotiated. Right. Was negotiated. They negotiated an extension of credit with the fishers. To which. Not that they negotiated it, but to which it was negotiated. That's a strange locution. But it seems to have emphasis on who was getting the credit. Well, I don't know what they mean by to which because you don't negotiate to which. You negotiate with which or maybe for which. But to which just doesn't fit. And my point is. In the normal course, setting aside the banking regulations, one would think the fishers stood in the position, as the district court found, of third-party beneficiaries of a credit arrangement between the borrower, Bass, and with whom the bank negotiated. Now, the fishers were clearly aware and dependent upon that transaction going through. But where's the direct relationship between the bank and the fishers? I guess my response, Your Honor, would be that you can say in the normal course, that may be actually very accurate. But the problem is we have to deal with the definition, which doesn't say anything about the normal course. It has a very broad definition of borrower. If one were to try and straighten out the grammar here, you would be likely to say negotiate with whom it was negotiated. Was it negotiated with the fishers? Well. I guess the bottom line is I don't really understand how you're suggesting this language should be read that brings in the fishers. Then let me try to make it so. We're here to construe a contract. Okay. The contract has a definition. I know, but try to put in some coherent sentence how this reaches the fishers. Well, if I could. Okay. Under Oregon law, you can't draw an inference that borrower means something that they didn't state in the contract. No, but you have to give borrower its ordinary meaning. People don't have to write contracts in a way that ignores the common sense and normal construct of borrower. For us to start reading in your argument that in the banking industry, borrower is freighted with the implied adoption of federal regulations, maybe so. But to say they had to rule out some kind of transaction, the only thing that brings it in, arguably, is negotiated. Right? That's what you're highlighting. Our position is that the fishers were borrowers because they were any person to which an extension of credit was negotiated. To which? Your Honor. Not with which? With whom? Okay, so that's your argument. If I could go back to your first point. If you're right that you have to take a word and its ordinary meaning in all circumstances, then there was no reason for the bank to come up with a special definition of borrower. All they do is say borrower is borrower. But this is what I was asking you. Let's do it with which it was negotiated. Are you claiming that this was negotiated with the fishers? I'm claiming that there's evidence in this record that the fishers, through their lawyer, negotiated with the bank terms of a loan that was going to be made to Bass, the proceeds of which would go to the fishers. That's the May 7th letter. So there is language and that letter is to the bank? Yeah, the May 7th letter. There's a revised May 7th letter that Vicki Rodriguez sent to Edward Fisher. It was sent in response to the Fisher's lawyer's letter of May the 12th. Please, please change the amount of the loan. It's going to be $4.6 million, not $6 million. And we want you to put as a last sentence in the second paragraph of your letter that we are relying upon this commitment. I think that is, I mean, I think it's in the record. But there's a May 7th letter and a May 12th letter. And when you read those together, a finder of fact could say that Vicki Rodriguez changed her commitment because of what the Stokes lawyer, I'm sorry, the Fisher's lawyer wanted her to do. That's the negotiation. In a letter to her? In a letter to her. I don't have the letter in front of me. Vicki Rodriguez's May 7th letter is to Edward Fisher. And if I could reserve my 20 seconds. No, those are up, but I'll give you a minute on rebuttal. That's what I say. Our clocks are a little confusing. Good morning, Your Honors. Lauren Podwell representing the appellee bank insurer with me today. In body, if not voice, in any event, is my co-counsel, Lisa Lear. Again, I appreciate the Court's willingness to swear me in this morning for this argument. Your Honors, this case presents a fairly straightforward coverage issue under the DNO policy and the lender liability endorsement, both of which are claims-made policies. As claims-made policies, with a very limited exception under the DNO, they require there to be a potential claim that has to be both made against the insured and reported to the insurer during the DNO policy period. In this instance, the DNO policy period ended on December 1, 1998, and the insured bank opted not to purchase available tail coverage when it made the decision to insure with a different insurer. Which they wouldn't do if they thought they'd given notice of the claim during the policy period, which they thought they had. Well, I'm not sure which claim they thought they had, and I'm going to address that. The problem I have with the case, quite honestly, is this notice. It seems to me that there's a pretty good argument that the November 1998 letter provides the notice, and as I understand, and correct me if I'm wrong, but if the notice was under the DNO part of the policy, that you wouldn't be arguing that the notice was insufficient. It was notice of a prospective claim, correct? There would be insufficiencies in the notice, but the notice would have been timely under the DNO policy. Right. So then the legal question is whether there's a distinction between giving notice of a lender liability as opposed to a DNO thing. That's a legal question construing the contract, I understand. Okay. So then the question is, just assuming for purposes of argument, then why wouldn't, for lender liability purposes, this be as adequate, even if it wasn't perfect, as adequate as for the lender liability policy as it was for DNO? Let me answer that. Thank you, Your Honor. First, in terms of the notice, there has to be separate notices, and Judge Berzon pointed out the provision in the lender liability endorsement that specifically says that notice under the lender liability endorsement doesn't constitute notice under the DNO, and notice under the DNO doesn't constitute notice under the lender liability. But surely you could have a notice, a single notice under both. No. It contemplates separate notices, Your Honor. It doesn't say that. It doesn't say that anywhere. It just says that if the way I interpret that, it means that if you say, look, the director's, Rodriguez is the vice president, so she's going to be sued for such and such for, they're suing Rodriguez for negligence, and we put you on notice of that. That would be under the DNO policy, that she's the insured, and we expect you to indemnify and defend Ms. Rodriguez. But if they say, look, they're suing Ms. Rodriguez for negligence as vice president, and they're suing the bank for not fulfilling the loan obligation to their detriment, that seems like it's notice under both policies. And there's nothing that says that one notice can't suffice for both. It just says if the notice is solely under one policy, it doesn't count as notice under the other. We need to know under which, whether it's the policy or the addition to the policy, which is the claim. Justice Moskowitz, I wouldn't disagree with that assessment, that in one letter you could give notice under both policies. But you do have to give notice that you're giving notice under both the DNO and the lender liability. If we look at the notice that was given on November 17th, that notice is defective for giving notice under the lender liability for several reasons. One is the district court found it makes reference only to the DNO policy. And I think more importantly ‑‑ How can that be when it specifically talks about a claim against the bank court? Your Honor, because it mentions a claim against the bank, as was pointed out, a claim against the bank could be against the bank's officers and directors. I mean, this is why these notices need to have some specificity. Rodriguez, although they say employee, was an officer. She was the vice president of the bank. And under the DNO policy ‑‑ But that specifically says a claim against West Bank Court, which isn't covered by the DNO policy. Am I wrong about that? But it is not clear as to what that claim might be. Let's throw something else into the mix. On the July 14th, 1999, analysis response to the actual complaint, the bank insurer goes through and analyzes why there isn't coverage. And if you turn over to ER 72, it talks about policy language. And the number A under that is Directors and Officers Policy Language, June 1998 version. That's what it's titled. And it runs through and it gets down to Wrongful Lending Act. It's not segregating out. It's all under the heading of the DNO policy as a generic reference. And it goes to Wrongful Lending Act. Then it goes over under paragraph 3 and makes separate DNO coverage analysis. So going back to the letter and the thrust of our questions, the insurance company in itself doesn't make this bright line distinction. It understands that there's an overarching policy. So then the question is whether they had to say, and by the way, when we say that as a reference in their letter, DNO policy, we really mean DNO plus the endorsement, even though the insurance company lumps them all together in its documentation. Justice Fisher, I will ---- I'm a judge. There's no justice in the Ninth Circuit. Okay? Excuse me, Your Honor. We're all judges. Your Honor, I will acknowledge that the weaker of the arguments is that the notice wasn't sufficient to cover both the DNO and the lender liability. The much stronger argument here, and that is very significant, is as to whom were they giving notice of a potential claim? At the time that this ---- Can I back up for a minute? We seem to be merging several different problems here. The first one of which, as I understand it, and probably the most important, is does the definition in the basic policy that says that a claim includes a notice of a claim that hasn't been made yet carry over to the endorsement part of it? I mean, isn't that really the core of the problem? Well, I think that's ---- Certainly if Section Roman numeral VIII of the basic policy does not carry over to the lender liability endorsement, I think the discussion is ended at that point. In the policy, it lists the endorsement. It says all the parts of the basic policy. It says Section ---- let me see if I can get to it quickly. Section F or V. It is further understood and agreed that the clauses, terms, and conditions forming the basic policy, which is the DNO policy, and any applicable endorsement shall be deemed part of the endorsement, except as follows. So if they didn't say except as follows, 8B is in. Case over. But then they list 1, 2, 3, 4, 5, 6, and the only thing that I think you can really point to is Part V, which it says is understood and agreed that the giving of notice of claim under the coverage provided by this endorsement does not constitute proper notice under the other one, et cetera. But nowhere does it say that you can't give them notice before the policy terminates of a potential claim. Even that Part V doesn't eliminate that. And so 8B is in, it would seem to me, unless I'm missing something. I don't think it's in, Your Honor, because the lender liability endorsement does have its own specific notice of claim provision. Well, where is that? That's the one that Your Honor just cited to you, the one that says that notice of claim under the endorsement does not constitute notice of claim under the C&O policy. Well, let me ask this. Say they said lender liability. We are going to be sued because we screwed up and we promised to loan money to someone's detriment and we breached the contract and we're going to be sued. And here are the people and they satisfy all the notice of conditions, and they send it on the same day they sent the notice here. And they said we are putting you on notice of a claim under the lender liability. Would then you be on the hook for this? That would take care of the form of the notice defect, but our position would still be that the early notice provision of the basic policy is not part of and is inconsistent with the lender liability endorsement. Well, why didn't you exclude it? Because the endorsement says the opposite. It says everything else is included except the following. And 8B isn't excluded. But it's inconsistent, and the law provides that to the extent there's an inconsistency between an endorsement and a basic policy in terms of the endorsement coverages, the endorsement controls. But even if. But that's what I'm saying. It doesn't seem to be there's anything inconsistent. It says everything that's in the basic policy is included except the following six things. And one of those six things is not provision 8B. If you wanted to put it in there, you could have put 8, you could say 7. Provision 8B of the basic policy does not apply to lender liability claims. Your Honor, let's assume for a minute that, in fact, it is part of the lender liability endorsement. The policy does have very specific information that's required to be disclosed in Section Roman numeral 8B. The reasons for the insured's anticipation of a claim, nature, and date of the alleged wrongful act, the claim injury, the names of potential claimants, how the insured first became aware of the claim, et cetera. Wait a minute. Okay, so those are in there. So what's the, so you're saying that, so you say, and I'm confused now, because there's not that detail with regard to the D&O side of things either. But yet you said at the outset that under the D&O policy that was adequate notice of. No, no. No? I said it would have been timely notice, but still not adequate notice. Still not adequate. So it wasn't adequate for anything. It still was not there. And I think why it becomes important is it's undisputed that we're talking about two separate claims. Claim is defined, among other things, as a lawsuit. There were two separate lawsuits, one filed in 1999 by the Fishers, one filed in 2000 by Bass. There's a number of reasons why the Fisher lawsuit is not covered, including the borrower issue, which if I have time I'll get to. You may not have further questions on that. But in terms of if it's found that the Fisher claim is not covered, we still have to look at the Bass claim. And if we're looking at the Bass claim and we're relying on the early notice provision, if you find it applicable, we now have to determine whether or not they complied with that early notice provision. And the early notice provision specifically says that if you have some notice of a potential claim by a claimant, there was no potential claim when that notice was given in November 1998 of a potential claim by Bass and Stoke. At best, what that notice was, was a, at least I think defective, you may not think, notice of a claim by the Fishers. Why do you say that? Let me explain this, Your Honor. There's a number of reasons why. Number one, the reference in the notice, which is ER-62, identifies that the demand that was the basis of the notice was in October 1998. On October 1998, a demand for funding was pulled and sent to the Bank of Newport. That demand was sent by the attorneys for Fishers. It was not sent by or on behalf of Bass. It was not sent on or behalf of Stoke. See, I don't think, if anything, that the problem runs in the other direction. Bass is named here. And Bass is the one that didn't get the money. Fisher is not even ever named in this thing. So you might have an argument that Fisher, this doesn't cover Fisher, but it seems surely to cover Bass. Well, you know, insureds give notices of claims that are not covered all the time. I thought about this, and I thought that this was a good point, except you have to look at 8B. There are two parts to 8B. And I think if you're under 8B-1, you're right. But under 8B-2, it's a different situation. 8B-1 says that you can give advance notice. It says, if you receive written or oral notice from any party that's the intention of such a party to make a claim for the wrongful act, then that could be your notice. So that would reply to the Fishers, the demand. But it also says B-2, or the bank becomes aware of any circumstance that may give rise to a claim against an insured person for a specific alleged wrongful act. And so that's really, it seems to me what they're saying is, look, we're aware of a circumstance that could give rise to a claim by Bass, and we didn't fund Bass as long. That might be true, Your Honor, with the exception of one fact. And that is, is that the very day that the notice was sent, the bank interviewed Mr. Bass. And in the bank's memorandum of that interview, Mr. Bass stated that, in fact, he did not expect the bank to fund the loan. He stated that he was in the process of finding financing elsewhere and that he was hopeful that he would find that financing to make the Fisher problem go away. In fact, it wasn't for 18 months thereafter that the Bass claim was filed. And there's nothing in the record in the interim indicating a claim made by Bass with respect to his loan. In fact, the claim that he made, quite frankly, was in response to the bank substituting in for the Fishers. And they all proverb that a good defense is a good offense. It seems apparent that Bass decided when the bank became the plaintiff that he could fend off the foreclosure action and the action on the note by asserting some counterclaim that he could have asserted for the prior 18 months but chose not to. And specifically, it told the bank that he didn't have a claim against the bank. Well, wait a minute. I don't expect you to fund it. It's not the same as I don't have a claim. Right? In other words, I don't expect you to fund it as I understand you're not going to fund it. But that's not the same as saying, if you don't fund it, I don't have a claim, if I can't get the funding elsewhere. And it says that if they become aware of any circumstance that may give rise to a claim, not that will give rise, it's that may give rise. I mean, would you tell your client, oh, Bass says that we never extended to fund the claim, so you can waive any claim you might have against the bank? I'm sorry. I couldn't hear you. If your client, if Bass is your client, you say, well, we never expected the bank to fund this. We knew it was above their liability, even though they entered into a commitment to do so. Would you say, well, you've got no claim against the bank? Or would you tell them, well, you might have a claim. They agreed to do it, and you entered into this agreement with the Fishers? Why, then, would Bass have waited 18 months, didn't file a third-party claim against the bank, continued to litigate the claim, the foreclosure action that Fisher had brought without bringing the bank into it? But with all respect, that's not responsive. You're a lawyer for Bass, okay? And whatever Bass's intent may be, Bass is not waiving any claim. If you're sitting on the bank side, you're thinking, okay, look, there's a problem here. That led to this letter, and they're saying Bass is, under their view, you know, Bass is a borrower for sure. Therefore, we're giving the notice. And you're saying, well, they don't have all the details, how they first came to learn of it. Okay, maybe if they had given all of that, it would have led your client then to check further. But I guess one of my questions is, if those other details were that material to your client, then why didn't they just call back and say, wait a minute, we need some more information here? They just sit back and say, ha-ha, I got you, and we're going to let the policy expire, and boom. Now you haven't filled out point B, C, and D. I don't think that was the case, Your Honor. These notice provisions in a claims-made policy are very strictly constricted. I know they are. And unlike the cases that were cited by Plaintiff, the Oregon cases, that were proof-of-loss cases dealing with the attorney fees provision, the courts have been quite strict in enforcing the specific requirements of this provision. But to answer, and if I didn't before, I apologize, Judge Moskowitz, to answer your earlier question, in the same interview memo there's a discussion with Ms. Rodriguez, who talks about the fact that there was never an intention to make a loan to Bass. And, in fact, what appears to have happened here, and let me back up by saying that none of the indicia of a loan that you would expect was ever seen and is not part of this record. You don't see the terms of the loan. You don't see the interest rate. You don't see what the collateral is going to be. You don't see any of the terms of the loan. It appears that what was going on here was that as a favor to an existing customer and certainly something that shouldn't have been done, Rodriguez sends this commitment letter to the Fishers, and rightfully so I suppose the bank should have been sued for that, with the understanding with Bass that we're not going to make this loan. You're going to find the loan someplace else before the Fisher loan becomes due. And that's why we don't see anything in the record that you would expect if the bank at any time ever had any expectations of making a loan like the Bass, and the bank knew that. But they settled with Bass on the counterclaim. I mean, they gave real value, and that's why they're saying there's a loss. Well, and they didn't give real value. And let me, with the minute or so I have left, can I? You're actually over time, so finish that one because you are over time. The clock is running up on you now. Okay. Should I stop or can I answer the question? Answer the question. They recognized the $5.5 million loss on the Fisher loan. That's what they reported to the SEC under those forms. They then carried the property on the books between $400,000 and $800,000. Now, the loss was to Fisher. In the Bass settlement, they agreed to settle with Bass on the condition that the property be sold either to Bass or to Bass's nominee or assignee for $1.55 million. So, in fact, the bank unloaded a piece of property that was carrying on its books $400,000 to $800,000 for $1.5 million. One thing that's left out is they're waiving their deficiency judgment that they had an assignment from the Fishers. So they had a deficiency judgment against Bass that was originally the Fishers for like $3-something million. They waived that. I don't see how it could have been $3 million. The loan was $4.6 million, and they paid Fishers $5.5 million. I forget what the actual amount was. I think it was a small amount, but it's a good point, and I did not include that in the math here. Right. What is the value of the deficiency judgment that they waived? The bottom line is on their own books and records, the bank booked again. They booked again. That's how they did it for accounting, and presumably they did it properly and was approved by their board. All right. Thank you very much. Thank you. Thank you. The only point I wanted to raise is – Let him get out of your way so we're not competing. Sorry. Go ahead. The only point I wanted to raise, I have nothing to say in response to the argument. I just want to point out to Judge Berzon that in the record it's ER 56 and 57 where you will find the two letters I was referring to. I saw that. Thank you very much. All right. Thank you both, counsel. Appreciate it. Good argument, and case argued as submitted. We will stand in recess for about 10 minutes. Thank you.
judges: Fisher, Berzon, Moskowitz